IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| SIERRA CLUB, PHYSICIANS FOR SOCIAL RESPONSIBILITY, GEORGIA FORESTWATCH, and EILEEN LANGE, | |
| Plaintiffs | CIVIL CASE NO. 3:02-CV-151-JTC |
| v. | |
| GEORGIA POWER COMPANY, | |
| Defendant. | |

## O R D E R

This matter is currently before the Court on the parties' cross motions for summary judgment [#45, #46].  Also pending is Defendant's motion to strike [#108].  For the reasons that follow, Defendant Georgia Power's motion for summary judgment [#45] on Counts I and II is **GRANTED**.  Plaintiffs' motion for summary judgment [#46] on Count I is **DENIED**.  The motion to strike [#108] is **DENIED as moot**.

## I.    Factual Background

Plaintiffs Sierra Club, Physicians for Social Responsibility, Georgia Forestwatch, and Eileen Lange (collectively "Sierra Club") brought this lawsuit under the Clean Air Act's citizen-suit provision, which allows private entities to enforce the Act in court.  42 U.S.C. § 7604(a)(1).  The gravamen of Plaintiffs' Complaint is that Defendant Georgia Power's Wansley Steam-

Electric Generating Plant ("Plant Wansley" or "the Plant") in Heard County, Georgia, has violated its Title V Operating Permit by emitting large quantities of nitrogen oxides, particulate matter, and toxic air pollutants into the air.  Sierra Club seeks penalties for past violations and an Order enjoining the emission of large quantities of these pollutants in the future.

Plant Wansley burns fossil fuels in seven principle emission units to generate electricity.  As relevant to the pending motions, two are older units that use a pulverized coal combustion process and emit exhaust through a vertical stack approximately 1000-feet tall.  Plant Wansley's Title V Permit limits emissions from these coal fired units to 40% opacity.[1]  Permit Condition 3.4.2.  According to reports filed by Georgia Power based upon its own opacity monitors, Plant Wansley's emissions have exceeded this limitation on particulate matter on thousands of occasions.

Counts I and II of Plaintiffs' Complaint seek relief for these violations. Georgia Power now admits that these exceedances occurred, but argues that they are allowed pursuant to an exemption in the Georgia Rules for Air Quality Control (the "Georgia Air Rules") and Georgia Power's Title V

_____

[1] "Opacity" refers to the amount of light able to be transmitted through the emissions, and is a surrogate method for measuring particular matter. See Sierra Club v. Georgia Power, 443 F.3d 1346, 1350 n.4 (11th Cir. 2006) [hereinafter Sierra Club II].

2

Operating Permit,[2] which allows excess emissions resulting from startup, shutdown, or malfunction ("SSM") if three conditions are met: (1) the best operational practices to reduce emissions were used; (2) pollution control equipment was operated properly; (3) the duration of excess emissions was minimized.  Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7; see also Sierra Club II, 443 F.3d at 1353-57.  This exemption is known as the "SSM Affirmative Defense."

## II.    Procedural Background

On December 15, 2004, the Court ruled on the parties' cross-motions for summary judgment on Counts I, II, and III of Plaintiffs' Complaint.  As part of that ruling, the Court determined that Georgia Power could not raise the SSM Affirmative Defense because permissive language in the Permit evidenced only an agency's discretion to enforce the exceedance regulations.  Thus, because Georgia Power's own data revealed that the exceedances had occurred, the Court granted summary judgment to Sierra Club.

On January 20, 2005, the Court on Defendant's motion certified the case for interlocutory appeal.  Specifically, the Court certified the following

---

[2] The Court presumes familiarity with the Clean Air Act and underlying regulatory framework, which have been comprehensively discussed in prior rulings.  See Sierra Club v. Georgia Power, 365 F. Supp. 2d 1297 (N.D. Ga. 2004) (Camp, J.) [hereinafter Sierra Club I], rev'd, 443 F.3d 1346 (11th Cir. 2006).

controlling legal question:

> Whether, as a matter of law, Condition 8.13.1 of Defendant's
> Plant Wansley Title V Operating Permit provides Defendant with
> an affirmative defense to the opacity violations alleged in this
> citizen-suit brought under the Clean Air Act.

On appeal, the Eleventh Circuit answered affirmatively:

> We thus read the SSM condition in Plant Wansley's permit to
> restate that where a stationary source can demonstrate that it
> meets the listed criteria, exceedances during SSM "shall be
> allowed." . . . On remand, Georgia Power should be allowed to
> raise an affirmative SSM defense to the exceedances alleged by
> Sierra Club.  Of course, Georgia Power will be required to prove
> that the three criteria in Georgia's SSM Rule and the permit's
> SSM condition are satisfied for each instance of exceedance.

Sierra Club II, 443 F.3d at 1356-57.

The issue now before the Court is whether Georgia Power can establish

the SSM Affirmative Defense as to the opacity violations alleged by Sierra

Club.

## III.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) defines the standard for summary

judgment:  courts should grant summary judgment when "there is no genuine

issue as to any material fact . . . and the moving party is entitled to judgment

as a matter of law."  The substantive law applicable to the case determines

which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S. Ct. 2505, 2510 (1986).  "The district court should 'resolve all reasonable

4

doubts about the facts in favor of the non-movant,'. . . and draw 'all justifiable inferences . . . in his favor . . . .'" United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

As a general rule, "[the] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).  For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue.  If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting Four Parcels, 941 F.2d at 1437-38).

## IV.   Discussion

Plaintiff's Complaint divides the opacity violations into two categories. Count I alleges 159 events that were initially reported by Georgia Power as

resulting from something other than SSM.  Count II alleges roughly 4,000 opacity violations that were reported on the Quarterly Reports by Georgia Power as resulting from SSM.  The analysis for each Count follows a two-step process.  First, the Court must determine whether the opacity events alleged actually resulted from SSM.  In this context the Court will address the parties' legal contentions with respect to the classification of certain exceedance events.  Second, the Court must determine whether the prerequisites of the SSM Affirmative Defense are satisfied.

A.    Count I

1.    *Whether the Count I exceedance events resulted from SSM*

Count I identifies opacity exceedances that were initially reported by Georgia Power as resulting from something other than SSM.  For example, the Quarterly Reports attribute the cause of some of these events as "sootblowing," while the causes of others are listed as "increasing unit load" or "unknown."  The threshold question with respect to these events is whether Georgia Power can now assert, despite what the Quarterly Reports say, that the exceedances resulted from SSM.

Nothing in the Georgia Air Rules or Georgia Power's Operating Permit indicates that the initial identification of the cause of an exceedance event is final.  In fact, the Permit language suggests the opposite.  According to

6

Georgia Power's Operating Permit, the Quarterly Reports need only be based on "information and belief formed after reasonable inquiry," Permit Condition 5.3.1(f), and the cause of any opacity exceedance should be identified "if known." Id. 5.3.1(d). Supplementation of the cause after more extensive investigation is not mentioned, and therefore not prohibited as suggested by Sierra Club.

Moreover, concerns of pragmatism counsel for Georgia Power's ability to supplement. According to expert testimony, "short-term opacity events are often over before a root cause can be positively determined, and the operators, who must enter a reason for the excursion at the time of the event, must make a judgment based on the information available at the time." (McRanie Report at 18.) For example, McRanie explains that many of the Count I exceedances report the cause as "sootblowing or load change" simply because that is what is occurring at the time of the exceedance. (Id.)

Sierra Club posits that allowing Georgia Power to say one thing on the Quarterly Reports and change course when sued would disserve the purpose of the statute because it would not encourage Georgia Power to promptly investigate any exceedance events or fix the problem unless and until sued. Therefore, it seeks a rule that would limit Georgia Power to whatever cause is listed on the Quarterly Reports. While the Court understands Sierra Club's

concern, there is simply no evidence in the record to support its contention that Georgia Power only takes care to prevent exceedances when sued by public interest organizations.  As noted by Georgia Power's expert, Georgia Power complied with the 40% opacity limit between 99.7 and 99.9 percent of the time when periods of startup and shutdown are excluded.  (Sewell Aff. ¶ 24.)

In sum, Georgia Power is not bound by the reason codes listed on the Quarterly Reports, and it may attempt to show that the Count I exceedances actually resulted from SSM.  To attempt to meet this burden, Georgia Power commissioned the expert report of Richard McRanie.   McRanie undertook a detailed "root-cause" analysis of each Count I event based upon a review of the operating data collected at the time of each event and his extensive experience with power plant operations.  As a result of his study, he determined that, even though they were not initially reported as such, all Count I exceedances resulted from SSM.[3]

Sierra Club argues that 9 of the above-referenced 159 events do not qualify as resulting from SSM.   Sierra Club has not addressed the remaining

---

[3] McRanie concluded: "The vast majority of these [Count I] opacity excursions were infrequent, short-term (6-18 minute), inconsequential excursions, and it is my opinion that virtually all of these excursions are a result of equipment or system malfunctions."  (McRanie Report at 4.)  He determined that the remainder of the events resulted from startup or shutdown.  (Id. 29-45.)

150 events, and is therefore deemed to admit that these events resulted from SSM.  With respect to the exceedances it does challenge, Sierra Club offers primarily lay argument, and has not presented expert testimony.

Sierra Club's failure in this regard brings to bear an issue which has dispositive ramifications in this case: that is, to what extent Sierra Club is required in this case to present expert testimony in opposing Georgia Power's motion for summary judgment.

Under prevailing summary judgment jurisprudence,

[t]he moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue.  If the moving party makes such a showing, it is entitled to summary judgment <u>unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact</u>.

As noted, Sierra Club has presented no expert testimony on any issue in this case, including whether any of the 159 Count I events resulted from SSM.  In fact, Sierra Club did not even depose any of Georgia Power's expert witnesses. All that Sierra Club has done thus far is merely offer its interpretation of Georgia Power's expert testimony on these issues.

By way of example, six of the Count I events were initially listed as caused by "soot blowing."  Soot blowing is a regularly scheduled process which uses "a piece of equipment that blows out steam that knocks the

9

accumulation of . . . soot on . . . the [boiler]." (Jackson Depo. at 73:14-21.)

Georgia Power provided the testimony of McRanie on these six events, which

explained that "because soot blowing is a routine practice and does not

normally cause an opacity event, when soot blowing does contribute to an

opacity event it is because there was a separate malfunction in the

combustion system." (See McRanie Report at 18-19, 20.) McRanie thus

concluded that these 6 events resulted from SSM – specifically, from a

malfunction. In opposition, Sierra Club did not provide testimony, lay or

expert, contradicting McRanie's opinions. Nor did Sierra Club depose Georgia

Power's experts, in which case it might have been able to call McRanie's

analysis into question. Instead, Sierra Club merely argued that it is entitled

to summary judgment on these six events because they are related to

maintenance of the equipment and not to SSM.

Under Federal Rule of Evidence 701, non-expert or lay witness

testimony "is limited to those opinions or inferences which are (a) rationally

based on the perception of the witness, and (b) helpful to a clear

understanding of the witness' testimony or the determination of a fact in

issue, and (c) not based on scientific, technical, or other specialized knowledge

within the scope of Rule 702." Fed. R. Evid. 701 (emphasis added). Power

plant operations, including those devices and systems relevant to the issues

10

in this case, are highly technical and complex.  Accordingly, expert testimony based upon a thorough understanding of the scientific principles involved in power plant systems is indispensable, for example, to determine the cause of the exceedance events, or whether Georgia Power engages in best operational practices.

Sierra Club's failure to present expert testimony is fatal in this case.  In Webster v. Offshore Food Serv., Inc., the former Fifth Circuit determined that where the plaintiff offered no evidence "to undermine [the expert's] qualifications or credibility," "the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert witness."  Webster v. Offshore Food Serv., Inc. 434 F.2d 1191,1193 (5th Cir. 1970); id. at 1194 ("[I]n the absence of opposing evidence, the unequivocal testimony offered in support of the motion in this case supported the District Court's conclusion that there was no genuine issue of material fact to be resolved."); see also Luby v. Carnival Cruise Lines, Inc., 633 F. Supp. 40, 42 n.3 (S.D. Fla. 1986) ("Where, as here, an issue is one of the kind on which expert testimony must be presented, and the affidavit of the expert is uncontradicted, summary judgment is proper.") (citing Webster).

The Court has previously found that the McRanie Report is "fact-intensive" and  "reliable and admissible" under Daubert.  Sierra Club I, 365

11

F. Supp. 2d at 1311.  When Georgia Power presented the McRanie Report and the Sewell Affidavit in support of its position that the Count I events resulted from SSM, Sierra Club had the obligation to come forward with significant, probative evidence showing the existence of a triable fact.  Because it failed to do so, Sierra Club cannot create a triable fact as to whether any of these 159 events resulted from SSM.

 2. *Whether Georgia Power meets the prerequisites of the SSM Affirmative Defense*

Even though Georgia Power has succeeded in showing that the Count I events resulted from SSM, it must still show that it meets certain prerequisites in order to prevail on the defense.  The pertinent provisions of the Georgia SSM Rule provide:

> (i) Excess emissions resulting from startup, shutdown, [or] malfunction of any source which occur though ordinary diligence is employed shall be allowed provided that (I) the best operational practices to minimize emissions are adhered to, and (II) all associated air pollution control equipment is operated in a manner consistent with good air pollution control practice for minimizing emissions and (III) the duration of excess emissions is minimized.

> (ii) Excess emissions which are caused entirely or in part by poor maintenance, poor operation, or any other equipment or process failure which may reasonably be prevented during startup, shutdown or malfunction are prohibited and are violations of this Chapter (391-3-1).

Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7.  These requirements will in

12

shorthand be referred to as "best operating practices."

Georgia Power has presented uncontradicted expert testimony that it adheres to "best operating practices."  McRanie reports, <u>inter alia</u>, that: (i) Plant Wansley's low frequency of opacity events is "the result of superior operations and maintenance practices"; (ii) the Plant's pollution control equipment inspection and maintenance process is "the best [he] [has] ever observed"; and (iii) the Plant's "aggressive" practices to control opacity during startups are "superior to the vast majority of the utility plants in this country."  (McRanie Report at 4-5, 27-28.)  He concludes that "Plant Wansley follows best operational and maintenance practices to minimize opacity emissions and the duration of excess emissions at all times, including periods of startup, shutdown and malfunction." (<u>Id.</u> at 27.)

In the same regard, William Sewell, the Wansley Plant Manager with over 38 years of experience in the power plant industry, confirms that Georgia Power uses best operational practices.  (Sewell Aff. ¶ 22.)  Sewell reports, <u>inter alia</u>, that: (i) the Plant complies with its opacity limit between 99.7 and 99.9 percent of the units' operating time when periods of startup and shutdown are excluded; (ii) the Plant is an industry leader in plant operation and maintenance, placing it well ahead of comparable power plants in minimizing "forced outages"; (iii) the Plant consistently over-complies with its

particulate matter limit; and (iv) the Plant has taken aggressive steps to minimize emissions during and resulting from startup and shutdown.  (Id. ¶¶ 24-25, 28-30, 33.)

In contrast, Sierra Club contends that "[Georgia Power's] operating practices are clearly defective and fail to satisfy the SSM Affirmative Defense's requirements . . . ."  (Pls.' Supp. Brief [#106] at 22.) Again, however, Sierra Club has presented no expert testimony to bolster its averments.  It has, however, pointed to one alleged flaw in Georgia Power's repertoire.  It claims that Plant Wansley's precipitators were designed to be washed, that they were not, and that the failure to wash them resulted in an "excessive build up on the lower of the plates and wires in some areas . . . [, which] can lower the performance of the precipitator."  (Id.)  Sierra Club's attack fails on several fronts.  First, it is questionable whether the documents cited by Sierra Club stand for the proposition Sierra Club asserts.  Even if the precipitator was designed to be washed and was not, the document cited by Sierra Club states only that failure to wash "can lower the performance of the precipitator."  There is no indication of causation in record – i.e., whether failure to wash "does" or "has" affected performance in this case.  Although an expert might be able to draw that conclusion, where the issue involves a highly complex electromechanical device, Sierra Club's counsel cannot.

14

More importantly, unrefuted expert testimony by Georgia Power contradicts Sierra Club's claim that Georgia Power did not properly maintain its precipitators.  McRanie discussed the inspection and maintenance of Plant Wansley's precipitators and determined that the inspections and reporting "rival any ESP inspection report that [he] [has] ever seen . . . ." (McRanie Report at 23.)  He opined that Plant Wansley's "level of ESP inspection and maintenance is a highly advanced process in comparison to the electric utility industry as a whole."  (Id. at 24.)  McRanie concluded "that the aggressive ESP inspection and maintenance practices employed by Plant Wansley clearly are, to a large degree, responsible for the high level of ESP performance and reliability."  (Id.)  Sewell also concluded that Plant Wansley "has an excellent precipitator maintenance program."  (Sewell Aff. ¶ 37.)

In sum, in the face of overwhelming expert testimony that Georgia Power utilizes best operating practices at Plant Wansley, Sierra Club cannot create a genuine issue of material fact for trial, in the absence of expert testimony, by pointing to a few inconclusive documents.  Georgia Power is entitled to summary judgment on Count I.

B.    Count II

In Count II Sierra Club identifies approximately 4,000 exceedance events that were reported by Georgia Power as resulting from SSM.  The

15

Court first addresses Sierra Club's legal arguments regarding the definition of "resulting from startup" and whether the opacity standard applies when the units are not operating. Then, the Court addresses whether Georgia Power is entitled to summary judgment.

    1.    *Whether the Count II exceedance events resulted from SSM*

        <u>a.</u>    <u>definition of "resulting from startup"</u>

Georgia Power reported numerous exceedances which it classified as resulting from startup. Sierra Club argues that Georgia Power cannot possibly prove an affirmative defense for these exceedances because it does not keep the data necessary to do so. In this regard, Sierra Club points to the Wansley Permit, which defines "startup" as "the period lasting from the time the first oil fire is established in the furnace until the time that mill/burner performance and secondary air temperature are adequate to maintain an exiting gas temperature above the sulfuric acid dew point." Permit Condition 3.2.2. This definition defines startup by reference to four parameters: (i) mill/burner performance; (ii) secondary air temperature; (iii) exiting gas temperature; and (iv) sulfuric acid dew point.

Georgia Power does not maintain all of this data.[4] Therefore, Sierra

---

[4] Specifically, the record reveals that Georgia Power does not have data regarding mill/burner performance or sulfufic acid dew point, and that the secondary air and exiting gas temperature data is stored "in a form wholly unrelated to 'startups'"

Club argues that its attempts to label any exceedance as a startup must fail. (Pls.' Supp. Brief [#106] at 11 ("Georgia Power's failure to adhere to the Wansley Permit's definition of startup is fatal to Georgia Power's efforts to invoke the SSM exemption with respect to those exceedances that Georgia Power claims resulted from startup, because it renders the affirmative defense impossible to prove.").)   Sierra Club also argues that the language in the Georgia Air Rules which provides a defense for exceedances "resulting from" startups should be interpreted as "during" startup because in a broad sense, excess emissions "resulting from" startup would encompass all excess emissions, and therefore "the exception would swallow the rule."

Georgia Power counters that the "resulting from" language should be given its plain and ordinary meaning.  In addition, it argues that even though it does not keep the data which would determine when the startup as defined by the Permit technically concludes, it is irrelevant because the exceedances "resulted from" startup according to Georgia Power's operators and experts.

The drafters of the regulations and Permit could have provided an affirmative defense for exceedances which occur "<u>during</u> startup, shutdown, [or] malfunction," but instead provided a defense for exceedances "<u>resulting</u>

_____

and that "there are considerable gaps in the data over the past five years."  (Pls.' Supp. Brief [#106] at 8-9.)

<u>from</u>" those events.  Looking to other portions of the Permit reveals that when the drafters desired to use the word "during" they knew how to do so.  (<u>E.g.</u>, Permit Condition 3.2.2 ("The Permittee shall not burn used oil in any steam generating unit . . . <u>during</u> periods of startup or shutdown.") (emphasis added).)  The "resulting from" language used in the Permit contemplates a cause and effect relationship, which necessarily encompasses a broader scope than something that occurs "during."  Accordingly, the Court will not rewrite the Permit to impose a limitation not included by its drafters.

Therefore, the fact that Georgia Power does not keep the data contemplated by the Permit's definition of startup is only tangentially relevant to determining whether the event <u>resulted from</u> startup.  In other words, confirming the precise moment at which a startup ends is only dispositive to determine whether the event occurred <u>during</u> startup, not whether it <u>resulted from</u> startup.  Even if the instant when a startup ended were known, determining whether an after-occurring exceedance event "resulted from" that startup would still require an informed deduction, taking into account the totality of the circumstances.  Knowing when the startup technically ended might be useful in that determination, but it is not strictly necessary.

     <u>b.</u> <u>whether the opacity standard applies when the units</u>

18

<u>are not operating</u>

Many of the exceedances reported by Georgia Power occurred after the equipment had shut down and was offline, for example, during routine scheduled maintenance.  Sierra Club argues that Georgia Power cannot invoke the SSM exemption for these exceedances.  It argues that to permit such exceedances would only have the effect of delaying pollution until the unit is offline, not controlling it.  Georgia Power counters that the opacity standard does not apply when the unit is not operating.

Sierra Club is correct that the SSM Affirmative Defense would not be available to Georgia Power for these exceedances, as they appear to be totally unrelated to, and therefore could not have resulted from, a shutdown.  However, there is no indication in the Georgia Air Rules or the Permit that the opacity standard applies when the units are not operating.

Under the Clean Air Act, "[s]ources subject to Title V may not <u>operate</u> in violation of, or without, a Title V permit containing all applicable requirements."  <u>Sierra Club v. Leavitt</u>, 368 F.3d 1300, 1302 (11th Cir. 2004) (citing 42 U.S.C. § 7661a(a)).  Indeed, Georgia Power's Plant Wansley operates pursuant to a Title V <u>Operating</u> Permit, and pursuant to that Permit, opacity must be monitored "during all periods of <u>operation</u> of the affected facility . . . ."  Permit Condition 5.1.1 (emphasis added).

19

Expert testimony reveals that the most common cause of opacity exceedance events while the unit is not operating is maintenance activity in the boiler, ductwork, and precipitators.  (McRanie Report at 14.)  This maintenance involves removal of ash deposits, welding repair jobs, and replacement of worn mechanical parts.  (Id.)  According to McRanie, "[v]irtually all of this activity stirs up dust from the accumulated flyash inside the unit," which escapes from the [stacks] due to the "slight draft . . . maintained in the enclosed work areas so that the dust is removed from the area for safety, ventilation, and visibility reasons."  (Id.)

Nothing in the record indicates that the opacity regulations are intended to control these types of exceedances, as opposed to those exceedances relating to the combustion of fuel, which occur while the unit is operating.  In fact, the Georgia Air Rules appear to exempt many maintenance activities.  See Ga. Comp. R. & Regs. Rule 391-3-1-.03(6)(e)(3) (exempting various maintenance activities).

Despite these indications that the opacity limit does not apply while the unit is offline and not operating, Sierra Club argues that the Court should hold Georgia Power accountable for offline exceedances, speculating that a contrary rule would permit power plants like Plant Wansley to "dump their accumulated pollution out of the stack once they go offline . . . ."  (Pls.' Supp.

20

Brief [#106] at 13.)  While Sierra Club's argument has facial appeal, there is simply no evidence in the record to support its hypothesis.

> 2. *Whether Georgia Power meets the prerequisites of the SSM Affirmative Defense*

Each of the relevant[5] exceedance events listed in Count II resulted from SSM.  Therefore, the last question remaining to determine whether Georgia Power is entitled to summary judgment on the Count II exceedances is whether Georgia Power has prevailed in showing that it engages in "best operating practices."

As discussed extensively above, Georgia Power has presented powerful and uncontradicted expert testimony showing that it uses best operational practices to reduce emissions, operates pollution control equipment properly, and minimizes the duration of excess emissions.  Therefore, it is entitled to summary judgment on Count II.

## V.   Remedy

Although Georgia Power is entitled to summary judgment on Counts I and II, the Court has previously granted summary judgment to Sierra Club on two events in Count III related to operating a combustion turbine below 85

---

[5] As noted in Section IV.B.1.b, supra, the exceedance events identified in Count II which occurred while the units were not operating are not subject to the Permit's opacity limits.

megawatts.  That finding remains undisturbed.  Therefore, this case must proceed to determine what remedy is appropriate for these two violations.

The parties are encouraged to confer and jointly submit a proposed remedy based upon this Order.  Any jointly proposed remedy would be based upon the Court's ruling as stated in this Order and would not waive any legal position of either party for purposes of appeal.

If the parties cannot agree, each party is **DIRECTED** to submit a proposed remedy within twenty (20) days of entry of this Order.  At that juncture, the Court will either enter judgment based upon the parties' submissions or schedule a remedy hearing.

## VI.    Conclusion

Defendant Georgia Power's motion for summary judgment [#45] on Counts I and II is **GRANTED**.  Plaintiffs' motion for summary judgment [#46] on Count I is **DENIED**.  The motion to strike [#108] is **DENIED as moot**.

**SO ORDERED**, this 11th day of January, 2007.

_____
JACK T. CAMP
UNITED STATES DISTRICT JUDGE